**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| GENUS LIFESCIENCES INC., f/k/a LEHIGH VALLEY TECHNOLOGIES, INC., 514 North 12th Street, Allentown, Pennsylvania 18102, <br><br> Plaintiff, <br><br> vs. <br><br> TAPASYA ENGINEERING WORKS PVT. LTD., Plot No. A/212, Road No. 30, Wagle Industrial Estate, Thane - 400 604, India, <br><br> Defendant. | No.: 5:20-CV-03865 <br><br> JURY TRIAL DEMANDED |

**CIVIL ACTION COMPLAINT**

Plaintiff Genus Lifesciences Inc., formerly known as Lehigh Valley Technologies, Inc. ("Genus"), through its attorneys, K&L Gates LLP, brings this Complaint against Defendant Tapasya Engineering Works Pvt. Ltd. ("Tapasya"), and alleges on knowledge as to itself and its own acts, and on information and belief as to all other matters, as follows:

**INTRODUCTION AND SUMMARY OF ACTION**

1.      Genus brings this action for breach of contract and breach of express and implied warranties arising out of Tapasya's delivery of defective products that did not comply with the parties' agreement and were not of merchantable quality.  As described below, Genus refused to accept several products and revoked its acceptance of others pursuant to its contract with Tapasya and the Pennsylvania Commercial Code.  Despite recognizing its breaches, as further described below, Tapasya has failed to reimburse Genus for the defective products, nor compensate Genus for the damages that it incurred in connection with obtaining replacement products.

## THE PARTIES

2. Genus is a Pennsylvania corporation organized under the laws of the State of Pennsylvania with a principal place of business at 514 North 12th Street, Allentown, Pennsylvania 18102.

3. Tapasya is an Indian private limited company with a principal place of business at Plot No. A/212, Road No. 30, Wagle Industrial Estate, Thane - 400 604, India.

## JURISDICTION AND VENUE

4. This court has subject matter jurisdiction over this civil action based on diversity of citizenship pursuant to 28 U.S.C. § 1332. Genus is incorporated in Pennsylvania and its principal place of business is in Pennsylvania. Tapasya is incorporated in India and its principal place of business is in India. Therefore, there is complete diversity of citizenship. Furthermore, the amount of damages claimed is in excess of seventy-five thousand ($75,000) dollars, exclusive of interest and costs.

5. Tapasya is subject to personal jurisdiction in the Commonwealth of Pennsylvania, pursuant to 42 Pa.C.S. §§ 5322(a)(1) and (a)(2), because it transacts business in the Commonwealth, has contracted to supply goods in the Commonwealth, and consented to personal jurisdiction in the Commonwealth under the contract at issue in this action.

6. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## FACTUAL BACKGROUND

7. Genus is a specialty pharmaceutical company engaged in the development, manufacture, and commercialization of generic and branded pharmaceutical products. Genus manufactures its products in Allentown, Pennsylvania and distributes them to retail chains, hospitals, mail-order companies, and other dispensing organizations through various wholesalers

and distributors throughout the United States. Genus manufactures its products under Good Manufacturing Practices ("GMP"), and Genus's GMP compliance includes all aspects of its pharmaceutical operations, including the production facility and analytical laboratory, employee training, and other critical elements.

8. Tapasya markets and sells equipment to manufacture pharmaceutical products. As described in greater detail below, Genus placed purchase orders for Tapasya's products, but due to manufacturing defects, many of Tapasya's products failed to meet product specifications. Additionally, Tapasya's personnel spent several weeks trying to install and operate some of the equipment at Genus's facility, but they were unable to do so. As a result, and as described further below, Genus cannot use most of the equipment Genus purchased from Tapasya.

9. More specifically, Genus purchased various pieces of equipment from Tapasya to manufacture pharmaceutical products, including: high shear granulators, v-blenders, tray dryers, fluid beds, a tap cone mill, and a vibratory sifter. These products are described below.

10. High shear granulators use an impeller and chopper system to convert powders into dense granules, which can then be compressed together into a tablet.

11. V-blenders are used to mix pharmaceutical ingredients to achieve homogeneous blending.

12. Tray dryers are similar to large ovens, which are used to dry a variety of materials.

13. Fluid beds are used for cooling, heating, and drying of solid materials. Particles are "fluidized," often with air, in a bed and then cooled, heated, or dried.

14. A tap cone mill is used for shredding, sizing, and grinding of powders.

15. A vibratory sifter is a screening machine that helps separate materials based on particle size.

A.     **The Contract Between Genus and Tapasya**

16.     On February 12, 2016, Genus and Tapasya executed a contract (the "Contract"), a true and correct copy of which is attached hereto and incorporated herein as Exhibit A. Pursuant to the Contract, Tapasya agreed to "sell, transfer and deliver" the products to Genus in Pennsylvania by a given date in exchange for a purchase price.

17.     Pursuant to paragraph 6 of the Contract, Genus was permitted to "inspect the Products at any time" and if the "Products are defective in material or workmanship or otherwise not in conformity with the requirements of the order," Genus, in addition to its other rights, was permitted to "reject the same in whole or in part for full credit or require prompt action or replacement at Seller's expense, including costs of delivery and return." *See* Contract, Ex. A, ¶ 6.

18.     In paragraph 7 of the Contract, Tapasya "expressly warrant[ed] that the Products ordered and work covered by the [Contract] will," among other warranties: (1) "conform to the specifications, drawings, samples, or other description furnished or adopted by [Genus]"; (2) "be readily usable, within specifications"; (3) be "of good workmanship and materials"; and (4) be "free from defect of any kind." *See* Contract, Ex. A, ¶ 7.

19.     Tapasya further agreed to pay any "reasonable attorneys' fees" that "result[ed]" from any breach" of the Contract. *Id.*

20.     In paragraph 3 of the Contract, Tapasya and Genus agreed that "time [was] of the essence" in Tapasya's "delivery of the Products" and agreed that Tapasya would deliver the products "no later than June 25, 2016." Accordingly, Tapasya agreed to pay Genus a 1% penalty on the purchase value of each product delivered one week after June 25, 2016 up to a maximum penalty of 5% after five weeks. *See* Contract, Ex. A, ¶ 3.

21. In paragraph 10 of the Contract, Genus reserved the right "to terminate its obligations under any order with [Tapasya] . . . if any delivery is not made within the time provided." Further, if "no time is specified," then Tapasya agreed to deliver the products "within a reasonable time." *See* Contract, Ex. A, ¶ 10.

22. Finally, Tapasya agreed that all disputes related to the Contract shall be adjudicated in the federal or state courts located in the Commonwealth of Pennsylvania. *See* Contract, Ex. A, ¶ 14.

B.  **The Purchase Orders for the Products**

23. In 2016, Genus placed two purchase orders with Tapasya for twelve pieces of equipment. The purchase price for both orders was $1,130,857.50, plus additional shipping costs.

24. The first purchase order Genus place with Tapasya was for the following seven products for a purchase price of $574,032.00:

- Tray Dryer Lab Model, TAP-TD-1 ("Tray Dryer Lab Model");
- High Shear Granulator, TAP-HSMG-LAB ("HSG LAB");
- High Shear Granulator, TAP-HSMG-50 ("HSG 50");
- High Shear Granulator, TAP-HSMG 400 ("HSG 400");
- Tray Dryer, TAP-TD-72-ATM ("Tray Dryer ATM");
- V Blender 1 cubic foot & 2 cubic foot, TAP-VB-100 ("V Blender 100"); and
- V Blender 10 cubic feet, TAP-VB-500 ("V Blender 500").

*See* Invoice dated February 12, 2016, a true and correct copy of which is attached hereto and incorporated herein as Exhibit B.

25. The second purchase order that Genus placed with Tapasya was for the following five products for a purchase price of $556,825.50:

- Fluid Bed, TAP-FBE-400-S12 ("Fluid Bed S12");

- Fluid Bed Top Spray & Bottom Spray arrangement ("Fluid Bed Spray Arrangement");

- High Shear Granulator, TAP-HSMG-400-S12 ("HSG S12");

- Vibratory Sifter, TAP-VS-12 ("Vibratory Sifter"); and

- Tap Cone Mill, TAP-TCM-50 ("Tap Cone Mill").

*See* Invoice dated September 9, 2016, a true and correct copy of which is attached hereto and incorporated herein as Exhibit C.

C.  **The Defective Products Manufactured and Sold by Tapasya**

26. After months of delay, Tapasya finally delivered eight of the twelve products. Five of the seven products on the first purchase order were delivered in the fourth quarter of 2016, over five weeks after the June 25, 2016 deadline set out in the Contract. Three of the five products in the second purchase order were delivered at various points in 2017.

27. Of the eight products that were delivered, two are in use, two are awaiting qualification, and four were defective. Of the four products that were defective, Genus has returned three of them to Tapasya, and has attempted to return the fourth to Tapasya, but it has refused to respond. In light of the defective and late delivery of the products, Genus cancelled its order for the four remaining products.

28. The status of the products and the amounts that Genus paid to Tapasya are as follows:

| Equipment | Purchase Order | Purchase Order Price | Amount Paid by Genus to Date | Date Delivered | Status |
|---|---|---|---|---|---|
| HSG 400 | One | $178,003.00 | $142,403.00 | - | Cancelled |
| HSG 50 | One | $137,662.00 | $110,129.00 | Q4, 2016 | Returned |
| HSG LAB | One | $102,880.00 | $82,304.00 | Q4, 2016 | Returned |

| | | | | | |
|---|---|---|---|---|---|
| V Blender 100 | One | $30,295.00 | $24,236.00 | Q4, 2016 | Awaiting qualification |
| V Blender 500 | One | $42,527.00 | $34,021.00 | Q4, 2016 | Awaiting qualification |
| Tray Dryer Lab Model | One | $7,758.00 | $6,206.00 | Q4, 2016 | Tapasya requested Genus to scrap |
| Tray Dryer ATM | One | $74,907.00 | $59,926.00 | - | Cancelled |
| Fluid Bed S12 | Two | $194,662.00 | $97,331.00 | - | Cancelled |
| Fluid Bed Spray Arrangement | Two | $141,160.00 | $70,580.00 | Q4, 2017 | To Be Returned |
| HSG S12 | Two | $178,493.00 | $89,247.00 | - | Cancelled |
| Tap Cone Mill | Two | $32,883.00 | $16,442.00 | Q1, 2017 | In Use |
| Vibratory Sifter | Two | $9,629.00 | $4,815.00 | Q1, 2017 | In Use |

1. **The Returned Products**

29. Genus encountered a multitude of problems with the operation of four pieces of equipment following their delivery and assembly, resulting in Genus returning two of the products to Tapasya, Tapasya instructing Genus to scrap another, and Genus seeking to return the last product to Tapasya. More specifically, Genus returned the HSG LAB and the HSG 50. Tapasya instructed Genus to scrap the Tray Dryer Lab Model, and Genus is still attempting to return the Fluid Bed Spray Arrangement to Tapasya (collectively, the "Returned Products"). As described below, despite spending close to three weeks at Genus's facility, Tapasya's personnel were unable to install or operate the Returned Products in accordance with specifications.

30. The defects relating to the Returned Products are outlined below:

- **HSG LAB, HSG 50:** These products failed the operational qualifications and performance specifications. *See* Review of Tapasya Equipment PowerPoint, a true and correct copy of which is attached hereto and incorporated herein as Exhibit D, at 13 (HSG LAB is referred to as 2/5/10 12 bar machine and HSG 50 is referred to as 25/50 12 bar machine). Additionally, these products were delivered in October 2016, four months after the June 25, 2016 deadline. *Id.* Moreover, it took four weeks to assemble the HSG LAB and the HSG 50, and once they were assembled, they failed the qualification tests. *Id.* As a result, Genus could not use these products due to these defects and returned them to Tapasya.

- **Tray Dryer Lab Model.** Defects prevented this product from functioning as intended. For example, the clamps did not align to lock securely, the screens did not set securely within the clamps, the pins failed to engage in dedicated positions, and the integrity of the silicone seals was compromised. Tapasya personnel oversaw the attempted installation of the Tray Dryer Lab Model and were unable to make it operate within the product's specifications. As a result, Genus could not use this product as delivered due to these defects and Tapasya instructed Genus that it need not return the defective tray dryer.

- **Fluid Bed Spray Arrangement.** Tapasya sent a technician to Genus to assist with the installation of this product on October 18, 2017. Although the installation was physically completed, the technician could not calibrate the temperature sensors, and the temperature of the product in the bowl did not match the temperature display on the operating screen. As a result, the operating qualification could not be completed. Tapasya sent a technician to Genus again on November 6, 2017. Although Tapasya tried to fix the machine multiple times, Tapasya was unable to. Genus could not use this product due to these defects. Genus has attempted to return the Fluid Bed Spray Arrangement to Tapasya, but Tapasya has not attempted to collect the product from Genus.

31. Tapasya agreed that the HSG LAB, HSG 50, and Tray Dryer Lab Model were defective and agreed to Genus's request for a refund for the amounts paid for the Returned Products in the amount of $198,639.00. *See* April 2017 Emails Between Tapasya and Genus, a true and correct copy of which is attached hereto and incorporated herein as Exhibit E. Genus repeatedly requested the refund, and Tapasya responded with insincere promises to pay the refund to Genus. *See, e.g.*, May 2017 Emails Between Tapasya and Genus, a true and correct copy of which is attached hereto and incorporated herein as Exhibit F ("I will 100 % refund you your money it's just that it's a complex thing for me to have it sent back but want you to know we are on the job and we will and I repeat we will send 100 % money back to you."); April 2017 Emails Between Tapasya and Genus, Ex. E ("I shall initiate the process it shall take some time as the reserve bank rules are slightly stringent but we shall initiate the refund ASAP.").

32. After these promises and more delays, Tapasya agreed to pay a refund in full, in three installments beginning the week of June 19, 2017. *See* July 2017 Emails Between Tapasya and Genus, a true and correct copy of which is attached hereto and incorporated herein as Exhibit G. To date, however, Tapasya has failed to refund Genus any of the amounts that Genus paid for the Returned Products, even though Genus was permitted under the Contract to "reject" defective products "in whole or in part for full credit." *See* Contract, Ex. A, ¶ 6.

### 2. The Cancelled Products

33. By July 12, 2017, due to the numerous unresolved problems with the Returned Products and/or the delays in delivering any of the products, Genus had cancelled its orders for the products that had not yet been delivered, which included the Tray Dryer ATM, HSG 400, Fluid Bed S12, and HSG S12 (collectively, the "Cancelled Products"). *See, e.g.*, Emails Regarding Cancelled Products Between Tapasya and Genus, a true and correct copy of which is attached hereto and incorporated herein as Exhibit H.

34. Tapasya acknowledged and accepted the cancellation of these products on July 12, 2017. *Id.* To date, however, Tapasya has failed to refund to Genus any of the amounts that Genus paid for the Cancelled Products, even though the Contract permitted Genus "to terminate its obligations under any order with [Tapasya] . . . if any delivery is not made within the time provided" or if delivery is not "within a reasonable time" if no time period is provided. *See* Contract, Ex. A, ¶ 10.

### D. Genus's Damages

35. Tapasya owes Genus a refund for the Returned Products and Cancelled Products, a penalty for failing to timely deliver the products, calibration expenses, and other expenses that Genus was forced to incur to deliver the Returned Products back to Tapasya.

36. Tapasya previously acknowledged that it was in breach and owed Genus "about 600 k." *See* July 2019 Emails Between Tapasya and Genus, a true and correct copy of which is attached hereto and incorporated herein as Exhibit I ("We owe you money and yes we shall settle it."). To date, however, despite this acknowledgement, Tapasya has failed to refund to Genus any of the amounts that Genus paid for the Returned Products or the Cancelled Products in the amount of $658,126.00. Tapasya failed to refund Genus even though the Contract stated that for the Returned Products Genus was permitted under the Contract to "reject" defective products "in whole or in part for full credit." *See* Contract, Ex. A, ¶ 6. Tapasya also failed to refund Genus even though the Contract permitted Genus "to terminate its obligations under any order with [Tapasya] . . . if any delivery is not made within the time provided" or if delivery is not "within a reasonable time" if no time period is provided. *See* Contract, Ex. A, ¶ 10.

37. Tapasya failed to pay for the expenses to return the Returned Products in the amount of $17,600.00 and the expenses to calibrate the Returned Products in the amount of $5,797.00 even though the Contract stated that Tapasya would pay the "costs of delivery and return" for any rejected products. *See* Contract, Ex. A, ¶ 6.

38. Tapasya failed to pay Genus a penalty for failing to timely deliver the products in the first purchase order in the amount of $28,701.60 even though the Contract stated that Tapasya would deliver the products "no later than June 25, 2016," and Tapasya agreed to pay Genus a 1% penalty on the purchase value of each product delivered one week after June 25, 2016 up to a maximum penalty of 5% after five weeks. *See* Contract, Ex. A, ¶ 3.

39. In addition to the damages described above, Genus has also incurred damages because it has been forced to purchase and install replacement equipment.

40. Due to Tapasya's inability to manufacture and deliver products in accordance with the terms of the Contract, Genus was forced to purchase replacement equipment and redesign its facility to accommodate the different equipment. The replacement equipment that Genus was forced to purchase and the associated costs it was forced to incur are detailed below:

| Original Product | Original Product Cost | Replacement Equipment | Replacement Equipment Cost | Price Difference |
|---|---|---|---|---|
| HSG 400 | $178,003.00 | Glatt 200 L HSG | $306,870.00 | $128,867.00 |
| HSG 50 | $137,662.00 | Glatt 25 L HSG | $301,017.00 | $163,355.00 |
| Fluid Bed S12 | $194,662.00 | Glatt WS Combo 250 Fluid Bed | $530,472.00 | $335,810.00 |
| Fluid Bed Spray Arrangement | $141,160.00 | Glatt GPCG-2 | $265,000.00 | $123,840.00 |

41. In addition to the costs for the replacement equipment described above, Genus also had to pay an additional $405,400.00 for modifications to the Glatt WS Combo 250 Fluid Bed to allow it to operate at Genus's facility.

42. Therefore, Genus was forced to incur an additional $1,157,272.00 to purchase replacement equipment and redesign some of this equipment due to Tapasya's inability to manufacture and deliver products in accordance with the terms of the Contract.

## COUNT I – Breach of Contract

43. Genus incorporates by reference each allegation set forth in paragraphs 1 through 42 above, as if fully set forth herein.

44. Genus and Tapasya entered into the Contract, which is valid and enforceable. Pursuant to the Contract, Tapasya agreed to provide Genus with various products in return for an agreed-upon purchase price and deliver them by a specific date.

45. Pursuant to the Contract, Tapasya agreed that the products would "conform to the specifications, drawings, samples, or other descriptions furnished or adopted by [Genus]," be "readily usable," "of good workmanship and materials," and be "free from defect of any kind." *See* Contract, Ex. A, ¶ 7.

46. The Returned Products were defective and essentially non-functional. For example, the HSG LAB and HSG 50 failed to "conform to the specifications, drawings, samples, or other descriptions furnished or adopted by [Genus]" pursuant to paragraph 7 of the Contract. Furthermore, the Returned Products were not "readily usable," "of good workmanship and materials," and were not "free from defect of any kind" as they failed qualification testing, and despite Tapasya's repeated attempts to fix the defects in several of the Returned Products, it was unable to do so.

47. By delivering such defective and non-functional products, Tapasya breached the Contract.

48. Moreover, Tapasya breached the Contract by failing to deliver the products within the time specified in the Contract.

49. Tapasya has also breached the Contract by failing to refund to Genus any of the amounts that Genus paid for the Returned Products or the Cancelled Products.

50. Genus has complied with the Contract and performed all of its obligations thereunder.

51. Genus has incurred the damages described above as a direct and proximate result of Tapasya's breach of the Contract.

## COUNT II - Breach of Express Warranty

52. Genus incorporates by reference each allegation set forth in paragraphs 1 through 51, as if fully set forth herein.

53. Pursuant to the Contract, Tapasya expressly warranted that the products would "conform to the specifications, drawings, samples, or other descriptions furnished or adopted by [Genus]," be "readily usable," "of good workmanship and materials," and be "free from defect of any kind."  *See* Contract, Ex. A, ¶ 7.

54. Genus relied upon Tapasya's express warranties in selecting Tapasya as a product manufacturer and seller, and placing purchase orders with Tapasya, and these express warranties were a material part of the basis for the Contract.

55. Tapasya breached these express warranties because the Returned Products and Cancelled Products: (i) did not conform to Genus's specifications; (ii) were not readily usable as delivery was delayed and then once delivered, Tapasya spent weeks trying to install the Returned Products to no avail; (iii) were not of good workmanship because they did not pass qualification testing; (iv) were not free from defects of any kind.

56. Genus has incurred the damages as described above as a direct and proximate result of Tapasya's breach of express warranty.

## COUNT III - Breach of Fitness for a Particular Purpose

57. Genus incorporates by reference each allegation set forth in paragraphs 1 through 56, as if fully set forth herein.

58. The Returned Products and Cancelled Products contained multiple defects as described above.  The defects constitute a breach of the implied warranty for fitness for a particular purpose because Tapasya knew the purposes for which the products were to be used, knew when Genus needed delivery of the products, and knew that Genus was relying upon Tapasya's skill and judgment to furnish the products in a manner in which they would be suitable for their intended use, yet the products did not perform for the uses and purposes for which they were sold, nor could they be used by Genus.

59. Genus has incurred the damages as described above as a direct and proximate result of Tapasya's breach of the implied warranty of fitness for a particular purpose.

## COUNT IV – Breach of Implied Warranty of Merchantability

60. Genus incorporates by reference each allegation set forth in paragraphs 1 through 59, as if fully set forth herein.

61. Genus and Tapasya are merchants within the meaning of the Pennsylvania Commercial Code.

62. Tapasya implicitly warranted that the products were merchantable.

63. Genus breached the implied warranty of merchantability because the products were not merchantable as they could not be used for their ordinary and general purposes. Notably, Genus was unable to use any of the Returned Products or Cancelled Products.

64. Genus has incurred damages as described above as a direct and proximate result of Tapasya's breach of the implied warranty of merchantability.

## PRAYER FOR RELIEF

WHEREFORE, Genus demands judgment in its favor and against Tapasya and relief on its Complaint as follows:

a. For compensatory damages in excess of $150,000, including a refund of all payments made to Tapasya for the Returned Products and the Cancelled Products, costs incurred for testing and shipping the Returned Products to Tapasya, a contractual penalty for Tapasya's failure to timely deliver the products, and costs incurred to purchase and install replacement equipment;

b. Reimbursement of its reasonable attorneys' fees incurred in this action, in accordance with the Contract; and

c. Such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Genus hereby demands a trial by jury.

**K&L GATES LLP**

Dated: August 7, 2020   By: *s/ Laura K. Veith*

Laura K. Veith
Pa Bar No. 321680
laura.veith@klgates.com
K&L Gates Center
210 Sixth Avenue
Pittsburgh, PA 15222
T: 412-355-7456
F: 412-355-6501

*Counsel for Plaintiff Genus Lifesciences Inc.*